UNITED STATES DISTRICT COURTS
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

LENNOX PARRIS and
LESTER PARRIS,

                   Defendants.

---------------------------------------------------------------x

**MEMORANDUM AND
STATEMENT OF REASONS**

Case No. 05-CR-636 (FB) (S-2)

**BLOCK, Senior District Judge:**

    I have sentenced Lennox and Lester Parris today to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life. This case represents another example where the guidelines in a securities-fraud prosecution "have so run amok that they are patently absurd on their face," *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), due to the "kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Id.* at 510.

    Although I do not consider my sentence to be unusually lenient, I am nonetheless mindful that a departure of 300 months from the low end of the advisory guidelines range is a major one and "should be supported by a more significant justification than a minor one," *Gall v. United States*, ___U.S.___, 128 S. Ct. 586, 597 (2007); moreover, since I am of the view that the guidelines range "fails properly to reflect § 3553(a) considerations," *Kimbrough v. United States*, ___U.S.___, 128 S. Ct. 558, 575 (2007) (quoting *Rita v. United States*, ___U.S.___, 127 S. Ct. 2456, 2465 (2007)), "a closer review may be in order" in the event of an appeal by the government. *United States v. Cutler*, 520 F.3d

136, 156 (2d Cir. 2008) (quoting *Kimbrough,* 128 S. Ct. at 575).[1] For these two reasons, I

believe a fuller exposition of how I arrived at my sentence is warranted than normally

would be set forth in the space provided in the Statement of Reasons section of the

judgment; hence, I am attaching this document to the judgment as the requisite written

statement of reasons for the sentences I have imposed. *See* 18 U.S.C. § 3553(c)(2). As the

Second Circuit has made clear, § 3553(c)(2) remains obligatory despite the now-advisory

nature of the Guidelines. *See United States v. Rattoballi,* 452 F.3d 127, 138 (2d Cir. 2006).

## I

Although the jury found each defendant guilty of conspiracy to commit

securities fraud, six counts of securities fraud, one count of conspiracy to commit witness

tampering and one count of witness tampering, the nature of their crimes – while clearly

deserving of the punishment which I have meted out – is simply not of the same character

and magnitude as the securities-fraud prosecutions of those who have been responsible for

wreaking unimaginable losses on major corporations and, in particular, on their

---

[1] I am also mindful of the Second Circuit's recent intensive substantive scrutiny of
the district court's sentence in *Cutler,* which the white-collar criminal defense bar
rationally fears "will be interpreted by the district courts as reinforcing the pre-*Gall*
practice of requiring extraordinary justifications for downward variances. . . ." Br. for
the N.Y. Council of Criminal Defense Lawyers as *Amicus Curiae* in Support of Pet. for
Reh'g *En Banc,* at 12; *see also Cutler,* 520 F.3d at 176 ("By concluding that the sentences of
Cutler and Freedman are substantively unreasonable, the majority is substituting its
view of what their proper sentences are, for that of the district court, an exercise we are
reminded is not within our province to accomplish." (Pooler, J., concurring)); *United
States v. Jeross,* 521 F.3d 562, 587 (6th Cir. 2008) ("The recent *Blakely-Booker-Cunningham*
line of Supreme Court cases has given judges an opportunity to rid the system of some
of the worst aspects of guidelinism, but we judges soldier on by applying the old
mandatory system as though nothing of significance had happened." (Merritt, J.,
dissenting)).

companies' employees and stockholders, many of whom lost their pensions and were financially ruined. Yet the sentences entailed in those cases, such as Enron, WorldCom and Computer Associates, were each less, and in some cases markedly less, than the lowest end of the guidelines range in this case.

Here, the Parris brothers were engaged in a rather typical "pump and dump" scheme in the world of the high-risk penny-stock investor. At trial, the Government established that, in January and February of 2004, they issued several press releases falsely representing the business prospects and financial condition of Queénch, Inc. ("Queénch"), a fledgling publicly traded company based in Jericho, New York. As a result, shares of Queénch – which had traded at around $0.18/share immediately before the first press release was issued – began trading at artificially inflated prices; the share price peaked at $0.32 on January 29th, following the issuance of the third press release. The increased demand was also reflected in a dramatic surge in Queénch's trading volume, which had hovered at around 30,000 shares per day; during the period of the fraud, the volume of shares traded regularly reached into the millions.

"Queénch" was also the name the Parrises gave their company's product, a new breed of bottled water which they wanted to pitch to minorities. They were the sole directors and their criminal misdeeds centered around their efforts to establish a market for their new product; by and large, their press releases contained some degree of truthfulness about Queénch's business prospects, but they clearly went beyond mere puffing and the jury was entitled to view them as material misrepresentations.

More telling, perhaps, was the means by which the Parrises personally

capitalized on these misrepresentations. Between January and March of 2004, Queénch issued a total of 28.6 million new, unregistered shares to two Florida stock-promotion companies, Sprout Investments LLC and Alpine Equity LLC; the corporate resolutions authorizing Queénch's transfer agent to execute the issues were signed by both defendants as principals for the company.

In late February, Queénch's transfer agent, Richard Day of American Registrar, began questioning the issues of stock to Sprout and Alpine. The defendants provided a legal opinion supporting the transfers, but Day rejected it as inadequate. The defendants thereupon switched to a different transfer agent.

Sprout and Alpine sold the newly issued Queénch shares to the investing public for a total of approximately $4.9 million. At the same time, the companies made wire transfers totaling $2.56 million to Parris Global Sports Network, LLC, whose bank account was controlled by Lester Parris. The money ultimately made its way to both defendants.

The Securities Exchange Commission ("SEC") launched an investigation. During the investigation, Lennox asked his then-girlfriend, Terry Dussek ("Dussek"), to sign a back-dated statement that she had sold 4 million Queénch shares to Sprout and lent Parris Global Sports Network $300,000. Although Dussek refused, Lester nevertheless submitted the statement to the SEC with her forged signature. Both defendants later told Dussek to tell investigators that she had authorized them to sign her name.

The investigation was made public on March 19, 2004, when the SEC suspended trading of Queénch's stock, which was then trading at $0.13/share. When

4

trading resumed on April 2nd, the share price was $0.12; it steadily fell to between $0.01 and $0.02 by the beginning of 2005. As of September 2005, Queénch shares traded at $0.0005 – 1/20th of a cent – per share.

## II

As explained during the sentencing, under the strictures of the Guidelines, the Presentence Report ("PSR") correctly added up the applicable guidelines points to be 42 for each defendant because, pursuant to Guidelines §2B1.1(a)(1), the base offense levels were 7[2] and the following upward adjustments were applicable:

(1)  18 levels because the securities frauds caused more than $2,500,000 in loss, *see* Guidelines § 2B1.1(b)(1);

(2)  6 levels because the securities frauds involved 250 or more victims, *see id.* § 2B1.1(b)(2)(C);

(3)  2 levels because the securities frauds involved "sophisticated means," *id.* § 2B1.1(b)(9)(C);

(4)  4 levels because the defendants were officers or directors of a publicly traded company, *see id.* § 2B1.1(b)(15)(A);

(5)  3 levels because the defendants were managers or supervisors of criminal activity involving 5 or more participants, *see id.* § 3B1.1(b); and

(6)  2 levels because the defendants obstructed justice by tampering with a witness and providing forged documents and false testimony to the SEC, *see id.* § 3C1.1.

### 1. Amount of Loss

The Government and the PSRs relied on Application Note 3 of Guidelines

---

[2]Lester does not dispute that the reference in his PSR to a base offense level of 6 is in error.

§ 2B1.1, permitting the court to "use the gain that resulted from the offense as an alternative measure of loss" if actual loss "reasonably cannot be determined," and I agreed that the difficulties inherent in calculating loss to the market in this case made its use appropriate. In so doing, I noted that the use of gain as an alternative measure of loss likely inured to defendants' benefit. *See United States v. Rosen*, 409 F.3d 535, 550 (2d Cir. 2005) ("Using gains as a basis ordinarily will underestimate the loss[.]" (citation and internal quotation marks omitted)).[3]

There were two potential bases for calculating the gain: the $4.9 million that Sprout and Alpine received from the sale of Queénch shares, and the $2.56 million that found its way back to the defendants. The issue was academic insofar as both equated to an 18-level enhancement under § 2B1.1(b)(1).

I also determined that the gain was traceable to the defendants' frauds. Although Queénch's stock had pre-fraud value, injecting a total of 28.6 million new shares into the market over a period of only two months would have exerted an immense downward pressure on Queénch's share price, as the value of each share became increasingly diluted. I concluded, therefore, that there would have been no significant market for the new shares – and little to be gained from their sale – without the artificially

---

[3]Using the so-called "market capitalization test," *United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006), the Government estimated that the loss to the investing public was "about $11 million." Tr. of Mar. 24, 2008, at 36. However, perhaps mindful that if I were to subscribe to that approach for calculating the loss – which would add two more points to the loss enhancement, *see* Guidelines § 2B1.1(b)(1)(K) – the Guidelines would call for life sentences, the Government did not press the point. In any event, the court in *Ebbers* explained why there would be "a problem" with "this simplistic analysis." 458 F.3d at 127.

inflated demand created by the false press releases. Although it was impossible to determine with precision, I was satisfied that the frauds generated enough of the $4.9 million realized by Sprout and Alpine to account for the $2.56 million that was kicked back to the Parrises. *See United States v. Guang*, 511 F.3d 110, 123 (2d Cir. 2007) ("A district court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." (citations and internal quotation marks omitted)).

### 2. *Number of Victims*

An analysis of the trading data for Queénch shares proffered by the Government, without objection from the defendants, revealed "over 500 individuals who purchased Queénch stock after January 15, the date of the first false press release, and before February 5, 2004 (the date of the final charged press release), and who had not yet sold the stock by March 19, 2004, the date the SEC halted trading in Queénch stock and the fraud was revealed." Letter from Taryn A. Merkl & Jonathan E. Green (Jan. 8, 2008), at 6.[4] Because the number of identifiable victims exceeded 250, a 6-level enhancement was required under Guidelines § 2B1.1(b)(2)(C).

### 3. *"Sophisticated Means"*

On a prior occasion, I had stated that I was not inclined to impose a 2-level

---

[4]Since defendants did not challenge the Government's proffer, I did not ascertain a precise number of victims. At first blush, the trading volume during the frauds might suggest a larger number of victims. That figure, however, represents only the number of *shares* traded, not the number of individuals involved in the trades. In any event, the Government presumably would not have chosen to refer to 500 if the actual number were significantly more than that.

enhancement for sophisticated means because there was nothing particularly complex about issuing false press releases. *See* Tr. of Dec. 7, 2007, at 23-24. In response, the Government persuasively argued that the defendants' fraudulent scheme also involved concealing their involvement by issuing the press releases under a pseudonym, by using Sprout and Alpine to sell the newly-issued shares (which defendants would have been unable to do directly), and by channeling the "kickbacks" from Sprout and Alpine through Parris Global Sports Network. I was satisfied, therefore, that defendants' conduct, taken as a whole, was sufficiently sophisticated to warrant this enhancement.

### 4. *Officers/Directors*

There was no dispute that Lennox was a director of Queénch during the period of the fraud. Lester, on the other hand, argued that he had resigned from the board of directors before the press releases were issued; however, he did not offer any corporate minutes or other evidence attesting to this claimed resignation. Tellingly, both Lester and Lennox continued to sign documents as directors as late as March 5, 2004, when the company entered into a memorandum of understanding to promote its product in the Caribbean and Europe. Based on this evidence, the 4-level enhancement under Guidelines § 2B1.1(b)(15)(A) was required.[5]

---

[5]It is unclear from the record whether the Parrises were also "officers" of Queénch and, if so, what their responsibilities were. Since their status as directors triggered the enhancement, I was not required to grapple with the Guidelines' failure to prescind between different types of officers. I note, however, that all officers within a corporation are not necessarily cut from the same cloth. *See United States v. Jensen*, 537 F. Supp. 2d 1069, 1081 (N.D. Cal. 2008) ("[T]he relevant question is whether the public officer enhancement is appropriate because [the defendant] was the kind of Vice President who owed 'heightened fiduciary duties' to shareholders under the securities laws."); *In re Gap Stores Sec. Litig.*, 457 F. Supp. 1135, 1131 (N.D. Cal. 1978) ("Officers are

## 5. *Role in the Offense*

The evidence at trial established that the defendants directed Dussek to proofread the fraudulent press releases and directed Jonathan Sinclair and Herbert Haft to disseminate them on the Internet and elsewhere. In addition, the defendants directed two transfer agents to issue Queénch stock to Sprout and Alpine. Thus, the defendants satisfied the criteria for a 3-level "manager or supervisor" enhancement under Guidelines § 3B1.3.

## 6. *Obstruction of Justice*

The defendants' conduct during the SEC investigation fell squarely within the ambit of Guidelines § 3C.1.1. *See* Application Note 4(a) ("threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so"), 4(c) ("producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding"). The two-level enhancement for obstruction of justice was, therefore, justified.

### III

The defendants have no prior criminal record; therefore, with a Criminal History Category of I and total offense levels of 42, I could not have sentenced them to less than 30 years if not for *Booker* and its progeny because there was no basis that I could

---

correctly held to a higher standard of conduct than lesser employees . . . but even then courts are directed to look behind the title to determine whether some significant access to inside information actually accompanied the position. Unlike directors, officers do not necessarily possess any particular authority or responsibility.").

perceive, and none advanced by the defendants, for any downward departure.[6] Indeed, neither defendant presented any particular health concerns or unique family responsibilities. *See United States v. Martinez*, 207 F.3d 133, 139 (2d Cir. 2000) ("[D]efendant must be seriously infirm with [a] medical condition that cannot be adequately cared for by Bureau of Prisons to warrant [a] downward departure for extraordinary physical impairment[.]" (citing *United States v. Altman*, 48 F.3d 96, 104 (2d Cir. 1995)); *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) ("Because the Guidelines disfavor departure based on family responsibilities, such a departure is not permitted except in extraordinary circumstances."). Nor was there any evidence that their actions were the result of coercion, *see* U.S.S.G. § 5K2.12, diminished capacity, *see id.* § 5K2.13, aberrant behavior, *see id.* § 5K2.20, or any combination of permissible factors that could be aggregated under U.S.S.G.

---

[6] By statute, the maximum penalty for securities-fraud conspiracy is five years, *see* 18 U.S.C. § 371; each of the remaining eight convictions carries a statutory maximum of twenty years. *See* 15 U.S.C. § 78ff(a) (securities fraud), 18 U.S.C. § 1512(b) (attempted witness tampering), 18 U.S.C. § 1512(k) (witness-tampering conspiracy). However, under Guidelines § 5G1.2(d), I would have been required to impose consecutive sentences to the extent necessary to achieve the total Guidelines punishment:

> If the sentence imposed on the count carrying the highest
> statutory maximum is less than the total punishment, then
> the sentence imposed on one or more of the other counts
> shall run consecutively, but only to the extent necessary to
> produce a combined sentence equal to the total punishment.
> In all other respects sentences on all counts shall run
> concurrently, except to the extent otherwise required by law.

Like the rest of the Guidelines, § 5G1.2(d) is now only advisory. *See United States v. Kurti*, 427 F.3d 159, 164 (2d Cir. 2005).

§ 5K2.0. *See United States v. Broderson*, 67 F.3d 452, 459 n.1 (2d Cir. 1995). And while the commentary to Guidelines § 2B1.1 states that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense," the Second Circuit has only approved departure on this basis where an intended loss calculated under the Guidelines was "almost certain not to occur." *United States v. Canova*, 485 F.3d 674, 680 (2d Cir. 2007); *see also Cutler*, 520 F.3d at 161 ("To the extent that the [district] court viewed the loss calculation as overstating the seriousness of the offense itself . . . , we see no basis in the Guidelines – or in fact – for such a view. . . . The $106 million in losses not only were intended but were realized."). That circumstance was not present here. Moreover, there were no "'characteristic[s] or circumstances that distinguishe[d this] case as sufficiently atypical to warrant a sentence different from that called for under the guidelines[.]'" *United States v. Koczuk*, 252 F.3d 91, 96 (2d Cir. 2001) (quoting U.S.S.G. § 5K2.0 cmt.); *cf. United States v. Lara*, 47 F.3d 60, 67 (2d Cir. 1995) ("quantity/time factor" was a special factor not taken into consideration by Sentencing Commission in formulating drug quantity table, and could therefore be a basis for downward departure).

In sum, if not for the wisdom of the Supreme Court in recognizing the need to free district courts from the shackles of the mandatory guidelines regime, I would have been confronted with the prospect of having to impose what I believe any rational jurist would consider to be a draconian sentence. *See, e.g., United States v. Chabot*, 70 F.3d 259, 260 (2d Cir. 1995) ("The court's ruling that it did not have authority to depart simply because it believed the Guidelines-prescribed punishment was too severe is properly before us, and

11

that ruling was correct."); *Koczuk*, 252 F.3d at 96 ("'[D]issatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range.'" (quoting U.S.S.G. § 5K2.0, cmt.)).

## IV

Although I began the sentencing proceeding "by correctly calculating the applicable Guidelines range," *Gall*, 128 S. Ct. at 596, and recognized that "the Guidelines should be the starting point and the initial benchmark," *id.*, it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance. My search for more relevant guidance, therefore, had to proceed in other directions, although I would have much preferred a sensible guidelines range to give me some semblance of real guidance. Accordingly, I reached out to the parties for their thoughts.

To its credit, the Government shared my angst, recognizing that "your Honor is in a difficult position where you have an enormous guideline range," and conceding that "many reasonable sentences would fall outside that range." Tr. of Jan. 15, 2008, at 12. In the admirable discharge of the higher duty of Government lawyers "to seek justice, and not merely to convict," *Hawkins v. LeFevre*, 758 F.2d 866, 876 (2d Cir. 1985), AUSA Green commendably stated that "the Government is not advocating for a sentence under the Guidelines," and understood that a reasonable sentence "may well be one less, perhaps significantly less, than the guidelines range." Tr. of Dec. 7, 2007, at 10-11. Consequently, the Government joined me and defense counsel in a collaborative effort to search for an effective means to avoid what Judge Rakoff has appropriately described as "the utter

travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Adelson*, 441 F. Supp. 2d at 512.

We first explored whether the Second Circuit's recent decision in *United States v. Wills*, 476 F.3d 103 (2007), might have some relevance. There, the circuit court recognized that the "primary purpose" of § 3553(a)(6) – calling for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar crimes" – was "to reduce unwarranted sentence disparities *nationwide*." *Wills*, 476 F.3d at 109 (emphasis added). In order to give some content to this "purpose", the court ruminated:

> It is not entirely clear what exactly it means for a district judge to consider the effects of an individual defendant's sentence on nationwide disparities. On the one hand, in order to avoid redundancy with § 3553(a)(4), it must require something different than mere consideration of the Guidelines, which are the statute's primary vehicle for reducing nationwide sentence disparities. On the other hand, it cannot be that a judge must act as a social scientist and assess nationwide trends in sentencing with each new defendant - in effect, intuiting Guidelines revisions on an interim basis as a proxy for the Sentencing Commission. We think the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest. Even fulfilling their primary purpose with an eye toward the particular circumstances before them, judges must be mindful of the general goal, however elusive, of national consistency.

*Id.* at 110.

In light of *Wills*, I asked counsel to search for nationwide similarities in securities-fraud cases. Defense counsel submitted a small list of sentences, but the

Government – with more resources – was able to compile a broad compendium of sentences dating back to 2001, which I have attached as Appendix A. For my part, I reached out to the Sentencing Commission and learned that it does not keep such statistics. It did provide, however, its Second Circuit Statistical Information Packet for Fiscal Year 2006, which I have attached as Appendix B. It shows, in contrast to the 360-to-life guidelines range for the Parrises' crimes, the mean terms of imprisonment, in months, imposed by district courts nationwide for just about all crimes other than securities fraud, including murder (253.1), manslaughter (46.7), sexual abuse (103.5), robbery (91.5), drug trafficking (84.4), firearms (82.1), racketeering/extortion (95.6), pornography/prostitution (98.6), and general fraud (26.2).

After reviewing all of these data, I concluded that the holding in *Wills* was essentially conceptual since the data showed, as one might suspect, marked dissimilarities from case to case, causing me to surmise that it was realistically impossible "to line up similarly situated defendants on a national scale." Tr. of Mar. 24, 2008, at 16. I then raised the issue of whether there was any utility to the Government's compendium, and the following colloquy with the Government's counsel ensued:

> MS. MERKL: I'm saying that the Court should look to the comparable sentences provided in [Appendix A].
>
> THE COURT: So stop. Can I do a comparison, then, and look at those that are more or less similar and this is higher, this is lower, and so to draw a general feel or general sense of the information you've given me? I'm just asking you for guidance. How do I apply it?
>
> * * *
>
> MS. MERKL: I think that the Court should look to the sentences

14

|               |                                                                 |
| ------------- | --------------------------------------------------------------- |
|               | imposed in other cases, but the difficulty is that so many of them are fact-specific. So looking – |
| THE COURT:    | Absolutely.                                                     |
| MS. MERKL:    | – for sentences that are actually on all fours –               |
| THE COURT:    | Good.                                                           |
| MS MERKL:     | – with this case, the closest case that . . . the government was able to find was of course the John S[u]rgent case which is a case out of this District. |

\* \* \*

|            |                                                                 |
| ---------- | --------------------------------------------------------------- |
| THE COURT: | All right. Now, I could see some similarities between this case and S[u]rgent. I don't discount that. But I look at other things that you've given me and for example, in the Southern District's case of Formisano, we have an estimated loss of 9.8 million. For some reason, the guideline range is 70 to 87 months but that was a stipulated sentencing range. So I guess we should not consider that. All right. |
|            | Then we have, of course, E[bb]ers. Everybody knows about Enron. So there's you know, total destruction of thousands of people's pension rights. I mean horrific. And similar to our case, the guideline range is 360-life and that's post-Sarb[a]nes. Right? So there's some similarities there. |
|            | Now certainly when I consider separate and apart from Wills, the seriousness of this crime that Parris has committed – and it's pretty serious – should I or should I not sort of reflect upon E[bb]ers and say that, let's face it, 25 years compared to Parris. Parris is not at all similar to what happened in Enron. Would that be a proper analytical conceptualization by me? Not even talking about Wills, but in the sense that 3553(a)(1) – the seriousness of this crime. Should I compare it to other crimes such as Enron and say that if that was 25 years, obviously, ours should not be 25 years. Would that be a correct conceptual approach? |

| MS. MERKL: | I don't think there's any problem with that approach, Judge. |
|---|---|

* * *

| THE COURT: | So there is no benchmark, but I have to still have a fair sense of how to go about coming to a proper sentence here. |
|---|---|
| | So, you know, we all agree that we can look at the universe of some cases out there in terms of measuring the seriousness of this crime compared to what other Judges have done in other somewhat, you know, comparable situations, I guess, without saying it's a benchmark. Are we on the same page with that now? |
| MR. GREEN: | We are, your honor. |

Tr. of Mar. 24, 2008, at 20-25.

The Government and I were in agreement, therefore, that even if there were dissimilarities in the array of national securities-fraud sentences precluding the applicability of § 3553(a)(6) under *Wills*, they nonetheless bore upon the relative seriousness of the nature of the defendants' crimes under § 3553(a)(1). Thus, although the sentences in the Government's compendium obviously were impacted by many variables, such as whether they were imposed before or after the passage of the Sarbanes-Oxley Act,[7] or whether the defendant pleaded guilty or was a cooperator, it was perfectly clear that there was a correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced

---

[7]Enacted in response to Enron, WorldCom and other corporate scandals, the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745, was described by President Bush as "the most far-reaching reforms of American business practices since the time of Franklin Delano Roosevelt." Elisabeth Bumiller, *Bush Signs Bill Aimed at Fraud in Corporations*, N.Y. Times, July 31, 2002, at A1.

to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms.

Thus, on the double-digit side, amongst the non-cooperators, there are, as representative, the following:

| Name | Amount of Loss | Sentence |
|---|---|---|
| Bennett | $100 million | 14 years |
| Ebbers | over $100 million[8] | 25 years |
| Rigas (John) | over $200 million | 15 years |
| Rigas (Timothy) | over $200 million | 20 years |
| Skilling | over $1 billion | 24 years |
| Forbes | approx. $14 billion | 10 years |
| Kumar | $2.2 billion | 12 years |
| Ferrarini | $25 million | 145 months |

And on the single-digit, non-cooperator side of the Government's compendium, there are:

| Name | Amount of Loss | Sentence |
|---|---|---|
| Hotte | $67 million | 108 months |
| Formisano | $9.8 million | 78 months |
| Smirlock | $12.6 million | 48 months |
| Adelson | $50-$100 million (intended) | 42 months |
| Betts | $1.3 million | 366 days |

---

[8]Although Appendix A simply states the loss as over $100 million, presumably because any loss over this sum represented the outer limit for the loss enhancement under the applicable guidelines at that time, the loss occasioned by Ebbers, as CEO of WorldCom, with 2.9 billion shares of stock outstanding, was $2.2 billion. *See United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).

| Chavrat | $1.1 million | 6 months |
| Tursi | $1.1 million | 41 months |
| Scuteri | $2.5 million | 21 months |
| Kearney | $1.3 million | 51 months |
| Rutkoske | $12 million | 108 months |
| Cushing | $24 million | 97 months |

*See* App. A.

To be sure, there were undoubtedly a host of factors that entered into these sentences, and there were others that seem on the surface to defy this pattern – for example, *Surgent*[9] – but I simply could not dismiss, in assessing the nature and seriousness of the Parrises' crimes under § 3553(a)(1), the overall relationship of the amount of losses in those cases to the sentences imposed; fairness in sentencing required that I recognize that, although the Parrises' criminal conduct was reprehensible, they were simply not in the same league as the likes of the Enron, WorldCom and Computer Associates defendants.

## V

There were other concerns that I had in evaluating the nature and seriousness of the Parrises' crimes under § 3553(a)(1). Initially, I was cognizant of how the changes in the Sentencing Guidelines over the past several years reflected Congress' appropriate disdain for the current crop of corporate predators: If the Parrises had been sentenced

---

[9]I note, however, that although Appendix A states that Surgent's gains were approximately $6 million, the PSR calculated his guidelines range based on a loss to the investing public of $46 million; moreover, Judge Gleeson's sentence was undoubtedly influenced by the fact that Surgent received an upward adjustment for his role in the offense as "a licensed attorney [who] had practiced in the field of securities law." *United States v. Surgent*, Case No. 04-CR-364 (S-1) (PSR dated Nov. 16, 2005, ¶ 41).

under the pre-November 1, 2001 guidelines, their sentencing ranges would have been 78 to 97 months. Between then and January 25, 2003 – when the Guidelines were amended pursuant to the directives of Sarbanes-Oxley, *see* U.S.S.G., app. C, amend. 647 – the ranges would have risen to 168 to 210 months; the differences were occasioned by an increase in the loss calculation from 13 to 18 points and an additional two points for more than 250 victims. The spike in the current, post-Sarbanes-Oxley Guidelines applicable to the Parrises reflects an increase of one point to the base offense level, two more points for 250 or more victims, and the advent of a four-point uptick for the previously unaccounted-for category covering officers or directors of publicly traded companies.

As a consequence, we now have an advisory guidelines regime where, as reflected by this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment. Indeed, in *Ebbers,* the circuit court recognized that "[u]nder the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life imprisonment." 458 F.3d at 129. While I acknowledge that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes," *id.,* this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense.

Fortunately, thanks to the Supreme Court, district courts are now "allowed to impose a sentence that varies from the Guidelines based solely on . . . disagreements with the Guidelines," as long as they "state the basis for [their] disagreement along with 'sufficient justifications' for 'the extent of any departure.'" *Cutler,* 520 F.3d at 163 (quoting

19

*Gall*, 128 S. Ct. at 594). While it may well be that the 25-year sentence for someone like Ebbers – who, as CEO of a major multinational corporation with 2.9 billion shares of outstanding stock, was responsible for a $2.2 billion loss to hundreds of thousands of investors – was "harsh but not unreasonable," *Ebbers*, 458 F.3d at 130, any comparable sentence meted out to the Parrises, would, in contrast, be unreasonable as a matter of law.

My disagreement with the advisory guidelines range was not only driven by the double-digit/single-digit sentencing comparators in Appendix A, but also by the guidelines' "one-shoe-fits-all" approach for its number of victims, officer/director and manager/supervisor enhancements. Thus, in all securities-fraud cases, once the threshold of 250 victims is met, the same 6 points applies for the victim enhancement, whether the number of victims be in the neighborhood of 500, as apparently in this case, or in the hundreds of thousands, as in WorldCom.[10] The three-point leadership role enhancement attaches regardless, for example, of whether the requisite minimum of five, as here, were supervised, or 500. As for the four-level enhancement for officers and directors, there is simply no accounting for the differences their decisions may have had on destroying a major corporation affecting the lives of hundreds of thousands, compared to decisions – although inexcusable – of those jeopardizing the investments of several hundred investors in speculative penny stocks.

---

[10]According to the SEC, "[i]nvestors in 110 countries made nearly 450,000 claims" to the WorldCom victims' compensation fund. Press Release, SEC, Defrauded WorldCom Investors Set to Receive Initial $150 Million Payout From SEC "Fair Fund" (Oct. 20, 2006), *available at* http://www.sec.gov/news/press/2006/2006-179.htm. As of June 14, 2007, the fund had paid out more than $500 million in claims. *See* Press Release, SEC, SEC Distributions to WorldCom Fraud Victims Top Half-Billion Dollar Mark (June 14, 2007), *available at* http://www.sec.gov/news/press/2007/2007-118.htm.

All of these thoughts impacted my assessment of the nature of the defendants' securities-fraud convictions under the first subparagraph of § 3553(a). I also considered, of course, the fact that the defendants were also convicted of obstructing justice; if not for that, their guidelines ranges would have been between 292 and 365 months, and the sentences somewhat lower. I also assessed each defendant's personal history and characteristics, as put forth in their attorneys' submissions, as also required under § 3553(a)(1), as well as all the other § 3553(a) factors. *See United States v. Villafuerte*, 502 F.3d 204, 212 (2d Cir. 2007) ("While the district court did not recite its thoughts on each of the § 3553(a) factors, it is clear that we impose no such general requirement. . . ."). And I paid appropriate attention to the overarching purposes under § 3553(a)(2) to ensure that the sentences I imposed were sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

s/Frederic Block

FREDERIC BLOCK
United States Senior District Judge

Brooklyn, New York
August 14, 2008

*United States v. Parris, et al.,* 05-CR-636(S-2)(FB)
Exhibit A to the Government's Letter Dated February 13, 2008

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| **United States v. John Surgent,** 04-CR-364 (JG) (EDNY) | Defendant's gains were approx. $6 million | Trial | No | 168-210 (1998 Guidelines) | 14 years and $2 million in restitution | Defendant was involved in a pump-and-dump scheme involving stock in Orex gold mines. Defendant was in his 60s, but had a prior conviction for fraud. Conduct pre-dated Sarbanes-Oxley. |
| **Bennett v. United States** (SDNY) 2006 U.S. Dist. LEXIS 12395, 252 F.3d 559 (2d Cir. 2001) | $100 million | Trial | No | 188-235 months | 22 years (168 months) | Loss amount is total for all three defendants; defendant Bennett given a 2-year upward departure because he transferred assets outside reach of creditors.<br><br>Conduct and original sentencing pre-dated Sarbanes-Oxley. |
| **Formisano v. United States** (SDNY), 2005 U.S. Dist. LEXIS 11957 | $9.8 million | Guilty plea | No | 70-87 months | 78 months | Approximately 134 victims; plea agreement stipulated to a sentencing range of 70 to 87 months and restitution of $6 million. |
| **Smirlock v. United States** (SDNY), 2005 U.S. Dist. LEXIS 7321 | $12.6 million | Guilty plea | No | 46 to 57 months | 48 months | Government's loss estimate was between $12.6 and $77 million; court accepted defendant's loss estimate, which accounted for shareholder loss caused by a market downturn. |
| **United States v. Ebbers,** 458 F.3d 110 (2d Cir. 2006) | >$100 million | Trial | No | 360 months to life | 25 years | Ebbers was CEO of WorldCom, involved in accounting fraud over a period of approximately 1½ years. |

| Case/Citation | Estimated Loss Amount | Guilty plea/Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| **Cataggio v. United States**, EDNY, 2007 U.S. Dist. LEXIS 57488 | $80 million | Guilty plea | No | 210 to 262 | 141 months | Case involving 55 co-conspirators. Cataggio sentenced to 141 months, coconspirator Ageloff sentenced to 96 months. Conduct pre-dated Sarbanes-Oxley. |
| **United States v. Hotte**, 1999 U.S. App. LEXIS 20142, (2d Cir. 1999) | $67 million | Trial | No | | 108 months | Defendant was President, CEO and Chairman of a publicly traded company. Conduct pre-dated Sarbanes-Oxley. |
| **United States v. Rigas**, 490 F.3d 208 (2d Cir. 2007), 409 F.3d 555 (2d. Cir. 2005) 371 F.Supp.2d 474 (SDNY 2005) | >$200 million | Trial | No | | 15 years | John Rigas, involved in Adelphia scheme. |
| | | Trial | No | | 20 years | Timothy Rigas |
| | | Guilty plea | No | | 2 years probation | Michael Rigas (not convicted at first trial) |
| **United States v. Kohler** http://www.usdoj.gov/usao/fls/PressReleases/070925-01.html 07-cr-20446-PCH Southern District of Florida | $826 million | Guilty plea | No | | 5 years + $471 million restitution | **Defendants Kohler, Khan and Ziegler** pled guilty to a conspiracy in connection with a securities offering; each defendant sentenced to 5 years of imprisonment and ordered to pay restitution. |

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| United States v. Khan http://www.usdoj.gov/usao/fls/PressReleases/070925-01.html | $826 million | Guilty plea | No | | 5 years + $826 million restitution | See above. |
| 07-cr-20446-PCH Southern District of Florida | | | | | . | |
| United States v. Ziegler http://www.usdoj.gov/usao/fls/PressReleases/070925-01.html | $826 million | Guilty plea | No | | 5 years + $826 million restitution | See above. |
| 07-cr-20446-PCH Southern District of Florida | | | | | | |
| United States v. Causey | >$1 billion | Guilty plea | Yes | | 66 months | Enron Chief Accounting Officer. |
| United States v. Skilling 2006 WL 3030677 (S.D. Tex. 2006) | >$1 billion | Trial | No | 292-365 (2000 Guidelines) | 24 years (292 months) | Enron Chief Executive Officer; conduct pre-dated Sarbanes-Oxley. |
| United States v. Fastow | >$1 billion | Guilty plea | Yes | | 6 years | Enron |
| United States v. Olis, 450 F.3d 583 (5th Cir. 2006) | $79 million | Trial | No | 151 to 188 months | 6 years | Defendant was an accountant for Dynegy. The loss estimate was based on the intended loss; evidence on actual loss not accepted. |

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| United States v. Sharkey, 2005 WL 5568903 (Government sentencing memorandum for Olis) | $79 million | Guilty plea | Yes | | 30 days $10,000 fine | Accounting manager for Dynegy; testified against Olis. Sharkey gave birth to twins shortly before sentencing. |
| United States v. Foster 2005 WL 5568903 (Government sentencing memorandum for Olis) | $79 million | Guilty plea | Yes | | 15 months | Vice-President for tax at Dynegy; testified against Olis. |
| United States v. Adelson, 441 F. Supp. 2d 506 (SDNY 2006) | Intended loss between $50 and $100 million as to defendant Adelson | Trial | No | Life imprisonment (offense level of 46) | 42 months, restitution of $50 million | Defendant was COO of Impath. The district court found that Adelson was a late entrant to the conspiracy and distinguishable from other defendants, such as Ebbers. |
| United States v. Forbes, Slip Copy, 2007 WL 141952 (D.Conn. 2007) | Approx. 14 billion | Trial | No | 112 to 149 (1999 Guidelines) | 10 years, $3.3 billion | Defendant was the Chairman of Cendant Corporation. The sentencing range was determined under 1999 manual; the sentence imposed was within the applicable guidelines range. |

4

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| **United States v. Kumar** 1:04-cr-00846-ILG *See* http://topics.nytimes.com/top/reference/tim estopics/people/k/sanj ay_kumar/index.html | $2.2 billion | Guilty plea | No | life | 144 months and $8 million | CEO of Computer Associates; due to age of conduct, the 1998 Guidelines manual was used. |
| **United States v. Betts,** 2002 U.S. Dist LEXIS 20753 (SDNY 2002) | $1.3 million | Guilty plea | Yes | 30-37 months | 366 days | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| **United States v. Feeny,** 2002 U.S. Dist LEXIS 20752 (SDNY 2002) | Loss attributable to Feeny $75,000 | Guilty plea | Yes | 12-18 months | 3 years probation | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| **United States v. Chavrat,** 2002 U.S. Dist LEXIS 20751 (SDNY 2002) | **$1.1 million** | **Guilty plea** | **Yes** | **21-27 months** | **6 months** | **Scheme involved 21 brokers who** together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| **United States v. Tursi,** 2002 U.S. Dist LEXIS 20750 (SDNY 2002) | $1.1 million | Guilty plea | No | 37-46 months | 41 months | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| **United States v. Scueri,** 2002 U.S. Dist LEXIS 20749 (SDNY 2002) | $2.5 million | Guilty plea | No | 15-21 months | 21 months | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| United States v. Rueb, 2002 U.S. Dist LEXIS 20748 (SDNY 2002) | $560,000 | Guilty plea | No | 27-33 months | 21 months | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| United States v. Abish, 2002 U.S. Dist LEXIS 20747 (SDNY 2002) | $300,000 | Guilty plea | No | 15-21 months | 21 months | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| United States v. Turney, 2002 U.S. Dist LEXIS 20746 (SDNY 2002) | $480,000 | Guilty plea | No | 12-18 months | 15 months | Scheme involved 21 brokers who together caused a loss of 88 million; conduct pre-dated Sarbanes-Oxley. |
| United States v. Kearney, 2002 U.S. Dist LEXIS 20745 (SDNY 2002) | $1.3 million | Guilty plea | No | 51-63 months | 51 months | Scheme involved 21 brokers who together caused a loss of 88 million. His team lost $23.6 million; conduct pre-dated Sarbanes-Oxley. |
| Ferrarini v. United States, 2002 U.S. Dist LEXIS 9463 (SDNY 2002) | $25 million | Guilty plea | No | Approx. 135-168 months | 145 months | Sentence based on adjusted offense level of 33, which under the 1998 Guidelines manual resulted in a mandatory sentence of 135-168 months. Conduct pre-dated Sarbanes-Oxley. |
| United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2002) | $12 million | Trial | No | 108 to 135 months (Sentence imposed in April 1999) (1998 Guidelines) | 108 months | Defendant involved in pump-and-dump scheme; conduct predated Sarbanes-Oxley. Case remanded for resentencing due to the loss calculation. |

| Case/ Citation | Estimated Loss Amount | Guilty plea/ Trial | Cooperating Witness | Guidelines Range | Sentence | Comments |
|---|---|---|---|---|---|---|
| **United States v. Trupin**, 475 F.3d 71 (2d Cir. 2007), cert. granted and judgment vacated, 128 S. Ct. 862 (2008). | Tax evasion charges involving $6 million in unreported income | Guilty plea | No | 41 to 51 months | 7 months | Sentence originally reversed by the Second Circuit; opinion vacated and remanded after Gall. District court's sentence largely grounded on the defendant's age (69) and family circumstances (his wife was extremely sick and lacked financial means and medical insurance). |
| **United States v. Earls**, 157 Fed. Appx. 421 (2d Cir. 2005) (summary order) | Over $20 million | Trial | No | | 125 months | Second Circuit affirmed sentence, noting that it was below the applicable Guidelines range. |
| **United States v. Cushing**, 99 Fed. Appx. 269 (2d Cir. 2004) | $24 million | Trial | No | (2000 Guidelines) | 97 months | Conduct pre-dated Sarbanes-Oxley. |

## Table 7

## AVERAGE LENGTH OF IMPRISONMENT BY PRIMARY OFFENSE CATEGORY
### Fiscal Year 2006

| PRIMARY OFFENSE | National | | | Second Circuit | | |
|---|---|---|---|---|---|---|
| | Mean Months | Median Months | Number | Mean Months | Median Months | Number |
| TOTAL | 59.1 | 36.0 | 62,963 | 57.8 | 37.0 | 3,572 |
| Murder | 253.1 | 240.0 | 77 | 173.3 | 114.0 | 10 |
| Manslaughter | 46.7 | 37.0 | 59 | 13.3 | 12.0 | 3 |
| Kidnapping/Hostage Taking | 216.5 | 204.0 | 61 | 81.5 | 84.0 | 4 |
| Sexual Abuse | 103.5 | 60.0 | 256 | 39.2 | 33.5 | 6 |
| Assault | 41.3 | 30.0 | 502 | 21.2 | 7.0 | 9 |
| Robbery | 91.5 | 70.0 | 1,131 | 89.4 | 60.0 | 41 |
| Arson | 82.7 | 60.0 | 66 | 112.5 | 132.0 | 4 |
| Drugs - Trafficking | 84.4 | 60.0 | 24,248 | 70.0 | 52.0 | 1,656 |
| Drugs - Communication Facility | 47.0 | 48.0 | 354 | 30.2 | 28.0 | 41 |
| Drugs - Simple Possession | 16.1 | 4.0 | 294 | 15.1 | 6.0 | 18 |
| Firearms | 82.1 | 56.0 | 7,851 | 73.4 | 46.0 | 415 |
| Burglary/B&E | 19.7 | 16.0 | 41 | -- | -- | 0 |
| Auto Theft | 86.4 | 42.0 | 53 | -- | -- | 0 |
| Larceny | 18.3 | 12.0 | 728 | 16.0 | 13.0 | 40 |
| Fraud | 26.2 | 18.0 | 4,637 | 26.4 | 16.0 | 410 |
| Embezzlement | 15.1 | 12.0 | 294 | 16.9 | 12.0 | 13 |
| Forgery/Counterfeiting | 22.4 | 15.0 | 777 | 18.9 | 15.1 | 33 |
| Bribery | 20.9 | 15.0 | 108 | 18.4 | 18.0 | 9 |
| Tax | 22.4 | 15.0 | 361 | 19.4 | 13.5 | 22 |
| Money Laundering | 43.9 | 30.0 | 726 | 43.9 | 34.0 | 120 |
| Racketeering/Extortion | 95.6 | 60.0 | 576 | 105.5 | 63.0 | 128 |
| Gambling/Lottery | 12.7 | 8.5 | 39 | 13.9 | 7.3 | 23 |
| Civil Rights | 66.3 | 21.0 | 40 | -- | -- | 2 |
| Immigration | 23.5 | 18.0 | 16,653 | 26.0 | 24.0 | 394 |
| Pornography/Prostitution | 98.6 | 63.0 | 1,262 | 100.7 | 70.0 | 76 |
| Prison Offenses | 18.5 | 12.0 | 324 | 12.0 | 7.5 | 12 |
| Administration of Justice Offenses | 26.9 | 18.0 | 694 | 21.3 | 16.0 | 43 |
| Environmental/Wildlife | 15.1 | 13.5 | 42 | 20.7 | 25.5 | 6 |
| National Defense | 49.2 | 29.0 | 34 | -- | -- | 2 |
| Antitrust | 5.8 | 5.0 | 8 | -- | -- | 0 |
| Food & Drug | 25.2 | 19.0 | 16 | -- | -- | 0 |
| Other Miscellaneous Offenses | 18.8 | 6.0 | 651 | 20.4 | 6.5 | 32 |

Of the 72,585 guideline cases, 9,622 cases were excluded for one or more of the following reasons: zero months prison ordered (8,871), missing primary offense category (67) or missing or indeterminate sentencing information (751).

Of the 4,436 guideline cases from the Second Circuit, 864 cases were excluded due to one or more of the following reasons: zero prison months ordered (830), missing primary offense category (1) or missing or indeterminate sentencing information (34).

SOURCE: United States Sentencing Commission, Office of Policy Analysis, 2006 Datafile, OPAFY06.